Wendy Park (Cal. Bar No. 237331)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin, Suite 375
Oakland, CA 94612
Phone: 510-844-7138
Email: wpark@biologicaldiversity.org

Brandon Jones-Cobb (AK Bar No. 1610078)
(*pro hac vice* pending)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 1178
Homer, AK 99603
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org

Hannah Connor (VA Bar No. 74785)
(*pro hac vice* pending)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St. NW, Suite 1300
Washington, DC 20005
Phone: 202-681-1676
Email: hconnor@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological
Diversity and Sierra Club*

Nathaniel Shoaff (Cal. Bar No. 256641)
Elizabeth Benson (Cal. Bar No. 268851)
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
Phone: 415-977-5610
Email: nathaniel.shoaff@sierraclub.org
Email: elly.benson@sierraclub.org

*Attorneys for Sierra Club*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, | Civil Action No. _____ |
| *Plaintiffs*, | |
| v. | **COMPLAINT FOR DECLATORY AND INJUNCTIVE RELIEF** |
| UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in her official capacity as Secretary, United States Department of Agriculture; UNITED STATES | (Administrative Procedure Act Case) |

FOREST SERVICE; TOM SCHULTZ, in his official capacity as Chief, United States Forest Service; ANIMAL AND PLANT HEALTH INSPECTION SERVICE; MICHAEL WATSON, in his official capacity as Administrator, Animal and Plant Health Inspection Service,

*Defendants.*

## INTRODUCTION

1.     Plaintiffs CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB bring this action against Defendants BROOKE L. ROLLINS, Secretary of the United States Department of Agriculture, and UNITED STATES DEPARTMENT OF AGRICULTURE (collectively "USDA"), to challenge and remedy USDA's violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*., and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., with respect to USDA's rescission of regulations and procedures requiring public participation in USDA's and its sub-agencies' environmental reviews under NEPA, and USDA's unlawful major amendments to its NEPA regulations. Plaintiffs also bring this action against the following agencies within USDA to remedy their unlawful implementation of NEPA pursuant to USDA's challenged rulemaking: UNITED STATES FOREST SERVICE ("Forest Service"); TOM SCHULTZ, in his official capacity as Chief of the Forest Service; ANIMAL AND PLANT HEALTH INSPECTION SERVICE ("APHIS"); and MICHAEL WATSON, in his official capacity as Administrator of APHIS.

2.     This case concerns USDA's elimination of the public's vital role in federal agency environmental reviews for projects undertaken by it and its sub-agencies. With respect to the Forest Service, this includes the approval of logging, prescribed burns, mining, road construction, and additional projects and activities on national forests. It also applies to APHIS's exercise of broad authorities over plant and animal management, including the killing of predators and other wildlife, disposal of diseased livestock, and pesticide application to

agricultural products. In these and many other circumstances, NEPA requires that agencies prepare an environmental impact statement (EIS) that takes a "hard look" at the significant environmental impacts of a proposed action before approving it. Alternatively, agencies must demonstrate that the action's effects are insignificant in an environmental assessment (EA), or that the action falls within a "categorical exclusion" (CE) for actions that normally have no significant effects.

3.      For nearly 50 years, Council on Environmental Quality (CEQ) and USDA regulations required that federal agencies solicit public comment on a draft EIS and provided for public involvement in preparation of an EA. In the case of the Forest Service, these regulations also required public involvement when determining that a project may fall within a CE. Thus, for decades, CEQ's and USDA's regulations ensured that not just the agency decisionmakers but also the affected communities would be apprised of a project's environmental impacts before approval of a project. The opportunity to weigh in on a proposal and the agency's analysis within an EIS, an EA, or a CE allowed the public to alert an agency to significant environmental impacts the agency had overlooked, as well as ways to avoid or reduce harmful impacts. This led to better informed, and, inevitably, more environmentally protective decisions, as intended by NEPA's "look before you leap" mandate.

4.      Earlier this year, however, USDA dismantled its longstanding NEPA regulatory framework governing USDA project reviews, citing section 5(b) of President Trump's Executive Order 14154, Unleashing American Energy (Jan. 20, 2025), and its directive that "all agencies must prioritize efficiency and certainty above all other objectives," *id.* § 5(c). USDA's revised procedures, adopted in a rushed rulemaking process that sidestepped basic APA procedural requirements, now make public involvement in nearly all aspects of the NEPA process nonexistent or, at best, entirely discretionary. As a result, sub-agencies within USDA can leave the public in the dark as to the full scope of a proposed project and its impacts—or even the very existence of a project proposal, when an EA is prepared—until after the agency approves the project. And in the case of the Forest Service, which has historically approved more than 80% of its actions under CEs, the revised regulations eliminate the longstanding requirements to solicit

public comment and inform the public when it determines that a CE applies and thus the public may never learn about the agency's decision. Such inadequate and belated (or in some cases nonexistent) disclosure precludes meaningful public input and undermines NEPA's goal to promote informed agency decisionmaking.

5.      USDA adopted these procedures via a so-called "Interim Final Rule," which the agency finalized and made effective without any advanced public notice of, or opportunity to comment on, the rule, and which provided no explanation for USDA's major changes to its longstanding public participation procedures. Plaintiffs now seek judicial relief declaring that USDA's Interim Final Rule violates the APA and NEPA. Plaintiffs also ask the Court to vacate the Interim Final Rule, and to order that, in the interim, USDA, the Forest Service, and APHIS operate under USDA's and the respective sub-agency's prior NEPA procedures.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (APA). The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701–706.

7.      This Court has jurisdiction to order declaratory relief under 28 U.S.C. § 2201.  If the Court orders declaratory relief, 28 U.S.C. § 2202 authorizes this Court to issue injunctive relief.

8.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e) as this civil action is brought against an agency of the United States and officers and employees of the United States acting in their official capacities and under the color of legal authority; as Plaintiff Sierra Club maintains its principal place of business in this judicial district, in Oakland, California; as all Plaintiffs maintain offices in this judicial district; and as no real property is involved in this action.

## PARTIES

9.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit 501(c)(3) corporation incorporated and existing under the laws of the State of California, with its main California office in Oakland. The Center for Biological Diversity has over 93,000 members

throughout the United States and the world. The Center for Biological Diversity's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through science, policy, and environmental law. Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center for Biological Diversity is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for all of us.

10.     Plaintiff SIERRA CLUB is a nonprofit corporation organized and existing under the laws of the State of California, with its headquarters located in Oakland. Sierra Club is the oldest and largest grassroots environmental organization in the United States, with approximately 621,000 members nationally. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. Sierra Club and its state chapters perform this mission through advocacy, litigation, and educational outreach to members.

11.     The protection of wildlife, wildlands, ecosystems, and recreational opportunities on public lands and other areas affected by USDA's actions is central to Plaintiffs' missions. Plaintiffs and their members have a long history of involvement in proposed actions and activities by USDA and its sub-agencies, including actions on national forests managed by the United States Forest Service, and actions undertaken by APHIS impacting the health and management of wildlife and animals raised for agricultural purposes. Those activities include tracking proposals for development and/or resource extraction; commenting on proposed projects and their NEPA reviews to limit or eliminate damaging impacts; researching and analyzing potential environmental effects; surveying project sites; proposing project alternatives and mitigation measures; educating Plaintiffs' members and the public via newsletters, press releases, their websites, action alerts, and other communications; and activating their members and the public to weigh in on proposed projects. To carry out these activities, Plaintiffs and their

members rely on agency NEPA reviews for information about proposed projects that may otherwise be unavailable. Such information may include a project's proposed location, configuration, acreage, scope, activities, and timing; the condition of the existing environment and resources that would be affected; the project's predicted environmental effects, such as pollution emissions, habitat disturbance, and land-use conflicts, and the severity of those effects; and potential alternatives and mitigation measures the agency is considering to achieve the project's goals while reducing harmful effects.

12.     Plaintiffs' members use and enjoy national forests for hiking, fishing, hunting, photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities. Plaintiffs' members derive recreational, inspirational, religious, scientific, educational, and aesthetic benefit from their activities within the national forest system. Plaintiffs' members intend to continue to use and enjoy the national forests frequently and on an ongoing basis in the future, including this winter and spring.

13.     Plaintiffs' members live and recreate in or near areas nationwide where they enjoy observing, attempting to observe, photographing, and studying wildlife, including in areas impacted by APHIS's activities to control plant and animal disease outbreaks within industrial agricultural facilities, and in areas where Wildlife Services—a program within USDA sub-agency APHIS—engages in predator and other wildlife killing activities. The opportunity to possibly view wildlife or signs of wildlife in these areas is of significant interest and value to Plaintiffs' members and increases their use and enjoyment of public lands and associated ecosystems nationwide. Plaintiffs' members also have an interest in the health and humane treatment of animals. Plaintiffs' members have definite plans to visit public lands for the purpose of engaging in these activities in the near future.

14.     Plaintiffs' members have been extensively involved in the public comment and administrative process for agency actions taken by USDA and its sub-agencies pursuant to the APA and NEPA and/or rely on Plaintiffs and other organizations to engage in those administrative processes on their behalf.

15.     Plaintiffs' members who use the public lands administered by USDA and its sub-agencies and are otherwise affected by USDA's actions have a procedural interest in USDA fully complying with the APA's public participation requirements in the development, promulgation, and implementation of the Interim Final Rule.

16.     The APA's rulemaking procedures require public participation except in limited circumstances. USDA's failure to abide by those procedures deprived Plaintiffs and Plaintiffs' members of their procedural right to protect their concrete interests in participating in decisionmaking affecting the environments they use and enjoy around the country. As a result, USDA's rulemaking violation deprived Plaintiffs and Plaintiffs' members of their substantial and long-standing interest in NEPA public participation while simultaneously depriving Plaintiffs and Plaintiffs' members of their right to comment on that deprivation of interest or to receive advance notice of the deprivation.

17.     Plaintiffs have members who have visited and used, and will continue to visit and use, lands that could be harmed by future projects implementing the Interim Final Rule, including harm to their interests in recreation, wildlife viewing, plant observation, aesthetic enjoyment, scientific study, educational pursuits, and/or spiritual practices, among other uses. Plaintiffs' members regularly visit and engage in these activities within areas that could be the target of Interim Final Rule implementation and will continue to do so in the foreseeable future. Because of regulatory changes included in the Interim Final Rule, these future projects have been or will be approved without the benefit of public notice and comment on a draft EIS or public involvement in preparation of the EA, significantly reducing or eliminating Plaintiffs' and their members' ability to meaningfully participate in the NEPA review process for these projects, and increasing the risk of environmental harm within these specific areas. Those increased harms will reduce Plaintiffs' members' ability to engage in and enjoy their planned activities within these specific areas. These actual, concrete interests are directly connected to and jeopardized by USDA's failure to comply with its mandatory rulemaking requirements under the APA. Plaintiffs' members are therefore injured by USDA's failure to abide by the APA process that protects those concrete interests. The injuries would be redressed by the relief sought.

18.     For example, with respect to Forest Service projects approved under a CE, the Interim Final Rule eliminates Plaintiffs' and Plaintiffs' members' right to advance notice of, an opportunity to comment on, and decisional notice of the application of a CE. Plaintiffs and Plaintiffs' members therefore may not learn about a CE-approved project until long after it has been approved and implemented, by which time any recourse to prevent irreparable harm to their concrete interests would no longer be available. The elimination of notice and comment on CEs without following APA-required notice and comment rulemaking procedures threatens imminent irreparable injury to Plaintiffs and their members' concrete interests.

19.     For example, one of the Center for Biological Diversity's and Sierra Club's members is the Forest Management Issue Chair for the Lone Star Chapter of the Sierra Club and Chair for the Forestry Subcommittee of the Houston Regional Group of the Sierra Club. He has served as the Chair for these Sierra Club sub-entities for about 20 years. As part of his chair position, he provides comments on public notices published by the Forest Service related to potential agency activities on National Forests and Grasslands in Texas, including the Sam Houston, Davy Crockett, Angelina, and Sabine National Forests and Ranger Districts. He also frequently recreates each year in National Forests and Grasslands in Texas, including the Big Creek Scenic Area; the Lone Star Hiking Trail; the Winters Bayou Scenic Area; and other areas of the Sam Houston National Forest. He regularly visits and recreates in these places, and he has definite plans to return in the foreseeable future. In both his Chair and personal capacities, the member responds to public notices with site-specific, detailed comments about proposals that are of concern to Plaintiffs and Plaintiffs' members. Thus, this member has been harmed by USDA's removal of public notice and comment opportunities on scoping, application of categorical exclusions, environmental assessments, and environmental impact statements.

20.     Another member of the Center for Biological Diversity has traveled widely throughout his life to enjoy and experience the nation's public lands, including in California, Missouri, Arkansas, Arizona, and New Mexico. Since moving to Arizona in 2011, the member has regularly engaged in family outings, hiked, camped, picnicked, watched sunsets, hunted for signs of ancient cultures, sought solitude, enjoyed educational opportunities, and sought spiritual

renewal within national forests in Arizona and New Mexico, including the Coronado National Forest (visited 2-3 times per month); Tonto National Forest (once per month); Apache-Sitgreaves National Forest (once per month); and Gila National Forest (twice per year). The member has made definite plans to return once or twice per year to numerous National Forest, National Park, Bureau of Land Management, and National Wildlife Refuge lands in the future. The member has frequently relied on public participation opportunities previously provided by Defendants to receive notice of, learn about, and provide comments on proposed actions subject to NEPA. In view of the member's aesthetic, recreational, and spiritual interests in areas that will be affected by mining, logging, and construction projects on these public lands approved by Defendants in the future, this member is injured by USDA's decision to limit public dissemination of information about these projects and eliminate opportunities for public participation.

21.    Another member of the Center for Biological Diversity lives and works near the Cape Fear River in North Carolina, which he has visited since childhood and worked to protect since at least 2010. He travels and recreates by boat in the Cape Fear River several times per month, viewing wildlife and investigating potential pollution sources. The member is deeply concerned about environmental and public health impacts to the river caused by nearby concentrated animal feeding operations, such as impacts from pollution, mortality management, carcass disposal, and airborne emissions—many of which can contribute directly or indirectly to the spread of zoonotic diseases regulated by APHIS. He relies on APHIS public reports, including documents prepared under NEPA, to understand exposure risks to him and his family from these operations, and he relies on NEPA public participation opportunities to share crucial information with APHIS about its proposed actions. He also relies on Plaintiff organizations to represent his interests before APHIS and other agencies through public participation opportunities. Thus, the member is injured by USDA's decision to limit public dissemination of information about these projects and eliminate opportunities for public participation.

22.    USDA's rulemaking, including the failure to solicit prior public comment, violates Plaintiffs' and their members' rights under the APA, and will cause and threaten injury to Plaintiffs and their members until the Court grants the relief requested herein. A court order

declaring invalid and vacating the Interim Final Rule would redress Plaintiffs' and Plaintiffs' members' injuries, and restore the status quo ante, including the public's opportunity to comment on draft EISs and participate in the preparation of EAs, and in the preparation of CEs proposed by the Forest Service. An order requiring USDA to comply with NEPA and the APA, and to operate under USDA's prior NEPA procedures in the interim, would likewise restore the status quo ante and could result in a new rule that requires public participation in the preparation of an EIS, EA, and/or CE.

23.    Defendant BROOKE L. ROLLINS, the Secretary of Agriculture, is the highest ranking official within USDA and, in that capacity, has ultimate responsibility for the administration and implementation of the APA and NEPA within USDA, and for compliance with all other federal laws applicable to USDA and its agencies. Secretary Rollins is sued in her official capacity.

24.    Defendant UNITED STATES DEPARTMENT OF AGRICULTURE's primary missions are to provide assistance to America's farmers, improve health, end hunger, ensure food safety, provide market assistance, and conserve and protect natural resources.

25.    Sub-agencies within USDA that are subject to the Interim Final Rule include the United States Forest Service and the Animal and Plant Health Inspection Service.

26.    Defendant UNITED STATES FOREST SERVICE manages 154 national forests and 20 national grasslands spanning 193.1 million acres across 43 states and two U.S. territories. The Forest Service manages these lands for timber harvesting, grazing, minerals development, recreation, and other uses.

27.    Defendant TOM SCHULTZ is the Chief of the Forest Service and is the highest ranking official within the Forest Service, and in that capacity has responsibility for the administration and implementation of NEPA within the Forest Service, and for compliance with all other federal laws applicable to the Forest Service. Chief Schultz is sued in his official capacity.

28.     Defendant ANIMAL AND PLANT HEALTH INSPECTION SERVICE exercises broad authorities over plant and animal management, including the killing of predators and other wildlife, disposal of diseased livestock, and pesticide application to agricultural products.

29.     Defendant MICHAEL WATSON is the Administrator of APHIS and is the highest ranking official within APHIS, and in that capacity has responsibility for the administration and implementation of NEPA within APHIS, and for compliance with all other federal laws applicable to APHIS. Administrator Watson is sued in his official capacity.

## LEGAL BACKGROUND

### A.     National Environmental Policy Act

30.     On January 1, 1970, President Nixon signed into law the National Environmental Policy Act of 1969. Pub. L. No. 91-190, title I, § 101, 83 Stat. 852 (1970).

31.     NEPA declares a national policy "to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. Its "twin aims" are to ensure federal agencies "consider every significant aspect of the environmental impacts of a proposed action" and to "inform the public that it has considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec Co. v. NRDC*, 462 U.S. 87, 97 (1983). Accordingly, NEPA establishes "a set of 'action-forcing' procedures that require that agencies take a hard look at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

32.     Specifically, agencies must prepare a "detailed" environmental impact statement (EIS) when they propose to take "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(c), if those significant effects are "reasonably foreseeable," *id.* § 4336(b)(1). Among other things, the EIS must analyze the "reasonably foreseeable environmental effects of the proposed agency action," including "adverse" effects that "cannot be avoided should the proposal be implemented"; " a reasonable range of alternatives to the proposed agency action"; "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and "any irreversible and irretrievable commitments of Federal resources which would be involved in the

proposed agency action should it be implemented." *Id.* § 4332(2)(C)(i)-(v). The EIS must also discuss "steps that can be taken to mitigate adverse environmental consequences." *Robertson*, 427 U.S. at 351. Agencies "shall … ensure the professional integrity, including scientific integrity, of the discussion and analysis" in an EIS. 42 U.S.C. § 4332(2)(D).

33.     The EIS "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

34.     Although Congress granted agencies some flexibility in implementing NEPA, it also directed that agencies use "all practicable means" in cooperation with the public to fulfill NEPA's objectives:

> [I]t is the continuing policy of the Federal Government, *in cooperation with State and local governments, and other concerned public and private organizations*, to use *all practicable means and measures*, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

42 U.S.C. § 4331(a) (emphases added); *see also id.* § 4331(b) (establishing the Federal Government's "continuing responsibility" to "use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may … fulfill the responsibilities of each generation as trustee of the environment for succeeding generations," among other objectives (emphasis added)).

35.     Accordingly, Congress directed that agencies, "to *the fullest extent possible* ... shall ... identify and develop methods and procedures, in consultation with the Council on Environmental Quality …, which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with

economic and technical considerations." *Id.* § 4332(2)(B) (emphasis added); *see* section B, *infra* (detailing those procedures, including former CEQ and USDA regulations).

36.    NEPA established CEQ in the Executive Office of the President. 42 U.S.C. § 4342. The CEQ is a three-member council whose members are appointed by the President. *Id.*

37.    In 2023, in the first significant revision of NEPA since its 1970 enactment, Congress enshrined into law many of the CEQ NEPA regulations then in effect (formerly at 40 C.F.R. §§ 1500 *et seq.*). Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 321, 137 Stat. 10, 38 (2023).

38.    Among other things, the 2023 amendments codified the CEQ's provisions providing for an EA and "finding of no significant impact" when an agency elects to avoid preparation of an EIS notwithstanding potentially significant impacts. *See* 40 C.F.R. §§ 1501.5, 1501.6 (2022). Agencies must prepare an EA when the significance of an agency proposal's effects is unknown, or there is no reasonably foreseeable significant effect. 42 U.S.C. § 4336(b)(2). The EA is a "concise public document" that "set[s] forth the basis of [an] agency's finding of no significant impact." *Id.* This finding serves as the agency's determination that a proposed action "does not require the issuance of an [EIS]." *Id.* § 4336e(7).

39.    The 2023 amendments also codified CEQ's provisions allowing agencies to apply "categorical exclusions" in lieu of preparing an EIS or EA. *Id.* § 4336(a)(2). A "categorical exclusion" refers to "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of section 102(2)(C)." *Id.* § 4336e(1).

**B.    Regulatory History of NEPA's Public Participation Procedures**

40.    The CEQ and federal agencies, including USDA and its sub-agencies, have since NEPA's enactment recognized that the solicitation of public input throughout the NEPA process is a vital and practicable means to help ensure that agencies identify and consider potentially significant environmental impacts, weigh reasonable alternatives and mitigation measures to avoid or reduce impacts, and arrive at well-informed decisions that consider environmental values. As the Supreme Court has recognized, the EIS plays an important "informational role"

not just for decisionmakers but for the public: the EIS "gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provides a springboard for public comment." *Robertson*, 490 U.S. at 349 (cleaned up).

41.   Two months after NEPA's enactment, President Nixon issued an Executive Order directing agencies to develop procedures for public involvement to carry out NEPA's environmental objectives:

> Consonant with Title I of the National Environmental Policy Act of 1969 ..., the heads of Federal agencies shall ... [d]evelop procedures to ensure the *fullest practicable provision of timely public information and understanding of Federal plans and programs with environmental impact in order to obtain the views of interested parties*. These procedures shall include, whenever appropriate, provision for public hearings, and *shall provide the public with relevant information*, *including information on alternative courses of action.*

Executive Order 11514, *Protection and Enhancement of Environmental Quality*, 35 Fed. Reg. 4247, § 2(b) (Mar. 5, 1970) (emphasis added).

42.   Executive Order 11514 remains in effect today.

43.   Since shortly after NEPA's enactment in 1970, and until USDA's issuance of the Interim Final Rule in 2025, USDA, the Forest Service, and APHIS—like other federal agencies—required the agencies to provide for public notice and comment on draft EISs.

### *Council on Environmental Quality NEPA Regulations*

44.   In 1971, CEQ issued guidelines advising agencies to publish and consider public comments on a draft EIS. 36 Fed. Reg. 7724, 7726 (Apr. 23, 1971) (noting final EISs shall include "all comments received thereon by the responsible agency from Federal, State, and local agencies and from private organizations and individuals"). In 1973, CEQ revised the guidelines, fleshing out public input procedures. The guidelines advised agencies to "[p]rovide for circulation of draft [EISs] to other Federal, State, and local agencies and for their availability to the public," "consider the comments of the agencies and the public," and "issue final [EISs] responsive to the comments received." 38 Fed. Reg. 20550, § 1500.2(b)(1), (2), & (3) (Aug. 1, 1973).

45.    In 1977, to ensure uniform rules in NEPA's implementation across all federal agencies, President Carter issued Executive Order 11991, directing CEQ to issue regulations "for implementation of the procedural provisions of [NEPA]" that would be binding on all federal agencies, and that the regulations "be designed to make the [EIS] process more useful to decisionmakers and the public." Executive Order 11991, *Environmental Impact Statements*, § 1, 42 Fed. Reg. 26967 (May 25, 1977) (amending § 3(h) of President Nixon's Executive Order 11514).

46.    In 1978, CEQ promulgated regulations implementing NEPA. 43 Fed. Reg. 55978 (Nov. 29, 1978). CEQ's rulemaking aimed "to produce better decisions which further the national policy to protect and enhance the quality of the human environment." *Id*.

47.    Among other things, CEQ's regulations recognized that "public scrutiny [is] essential to implementing NEPA," 40 C.F.R. § 1500.1(b) (1978), and set forth a policy to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment," *id*. § 1500.2(d).

48.    Accordingly, the CEQ regulations, from their adoption in 1978 and through multiple recent amendments, consistently required public comment on draft EISs and public involvement in EAs "to the extent practicable," until their rescission earlier this year. 40 C.F.R. §§ 1501.4(b) (EAs) and 1503.1(a)(4) (EISs) (1978); 40 C.F.R. §§ 1501.5(f) (EAs) and 1503.1(a)(2)(v) (EISs) (2020); 40 C.F.R. §§ 1501.5(b) (EAs) and 1503.1(a)(2)(v) (EISs) (2022); 40 C.F.R. §§ 1501.5(e), (f) (EAs) and 1503.1(a)(2)(v) (EISs) (2024).

### *U.S. Department of Agriculture NEPA Regulations*

49.    Similar to CEQ, in 1971, USDA issued guidelines requiring public notice and comment on draft EISs. 36 Fed. Reg. 23666, 23669 (Dec. 11, 1971) (publishing Department-wide guidelines requiring that "[c]omments and views of the public will be solicited by publication of a notice in the Federal Register, or other appropriate media"). USDA issued these draft EIS procedures in apparent recognition that they are a "practicable" means of providing "timely public information and understanding of Federal plans and programs" and of "obtain[ing] the views of interested parties," as directed by Executive Order 11514.

50.     In 1979, USDA incorporated its NEPA procedures into regulations codified at 7 C.F.R. Part 3100, Subpart B. 44 Fed. Reg. 44802 (July 30, 1979). These new regulations "incorporate[d] and adopt[ed]" the CEQ regulations at 40 C.F.R. Parts 1500-1508. *See* 7 C.F.R. § 3100.20(a) (1979). They required each USDA agency to develop NEPA procedures meeting the requirements of the statute, CEQ's regulations, and USDA's NEPA regulations. *Id.* § 3100.21(b).

51.     In addition to incorporating CEQ requirements to publish draft EISs and solicit comment on them, USDA's 1979 NEPA procedures required that "[a]ll NEPA processes developed and followed by USDA agencies shall provide for public involvement." *Id.* § 3100.24 (1979) (citing 40 C.F.R. §§ 1501.4(e)(2), 1506.6, 1508.10).

52.     In 1983, USDA recodified its NEPA regulations at 7 C.F.R. Parts 1b and 1c. 48 Fed. Reg. 11404 (March 18, 1983).

*U.S. Forest Service NEPA Regulations*

53.     The Forest Service's first NEPA guidelines—dated July 13, 1971—required the agency to publish a draft EIS and make it available for public comment. 36 Fed. Reg. 23669, 29671 ("[T]he responsible official should distribute copies [of the draft EIS] to, and solicit comments from, appropriate Federal, State, and local agencies *and the public*." (emphasis added)). The guidelines required that, even before preparing and circulating a draft EIS, the Forest Service conduct "preliminary consultation" with the public. *Id.*

54.     In 1978, the Forest Service published new "Forest Service NEPA Process" guidelines. 43 Fed. Reg. 21254, 21256 (May 16, 1978). The Forest Service stated that important objectives for the guidelines included providing for "early and continuing participation of other agencies, organizations, and individuals having environmental responsibilities, expertise, or interest," as well as making the NEPA decisionmaking process "open and available for public review." *Id.* To accomplish these objectives, the 1978 guidelines required an EIS to be "prepared first in draft form," after which it would be "distributed for public review and comment." *Id.* at 21259.

55.    In 2008, the Forest Service revised its NEPA procedures and codified them in the Code of Federal Regulations. 73 Fed. Reg. 43084 (July 24, 2008). The Forest Service said the regulations "supplement[] and do[] not lessen the applicability of the CEQ regulations," and that they were "to be used in conjunction with the CEQ regulations and USDA regulations at 7 CFR part 1b." 36 C.F.R. § 220.1(b) (2008). The purpose of the codification was to provide "more visibility" and make the procedures "more readily available to the public, making it easier for the public and interested parties to engage the Forest Service during decisionmaking and to ensure they are following the regulations."  73 Fed. Reg. at 43084, 43085.

56.    The 2008 regulations recognized that the Forest Service remained subject to public involvement requirements under the CEQ regulations. *Id.* at 43086; *see also* 36 C.F.R. § 220.1(b) (2008). Thus, for example, the Forest Service would be required to make a draft EIS available to the public and invite comment on it. The 2008 regulations also reiterated the duty of the "responsible official" to consider "public and agency comments" in its decisionmaking, as well as "agency responses to those comments." 36 C.F.R. § 220.4(c)(2) (2008).

57.    The 2008 regulations also specified that CEQ's EIS scoping process requirements—including the requirement to solicit public comment on the scope of environmental issues to be addressed for a proposed project—applied to "all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS[.]" 36 C.F.R. § 220.4(e)(1) (2008).

*Animal and Plant Health Inspection Service NEPA Regulations*

58.    APHIS's initial NEPA guidelines, published in 1972, just two years after NEPA's passage, provided that an EIS would be "prepared in two stages," with a "draft" that would be subject to "review and comment by other Agencies and the public," followed by a final EIS that would "reflect[] the results of the draft review process." 39 Fed. Reg. 40048, 40050 (Nov. 13, 1974).

59.    APHIS revised its NEPA procedures in 1979. *See* 44 Fed. Reg. 50381 (Aug. 28, 1979). Those guidelines required each NEPA analysis to "have designated major decision

points," which included "completion of a draft EIS" and "evaluation of comments and completion of final EIS." *Id.* at 50382.

60.     The 1979 APHIS guidelines also set forth robust public involvement requirements, including that officials would be required to "inform and involve the public" at multiple steps in the NEPA process, through the use of "distribution lists of interested persons," "direct verbal contact, meetings, printed materials, news media, public notices and hearings, and any other appropriate means of increasing public participation in evaluating the environmental impact of agency actions." *Id.* at 50383.

61.     In 1995, APHIS replaced its 1979 NEPA guidelines with regulations codified at 7 C.F.R. Part 372. *See* 60 Fed. Reg. 6000 (Feb. 1, 1995). Those regulations specifically required that "[a]ll public and other involvement in APHIS' environmental impact statement process, including the scoping process, commenting on draft documents, and participation in the preparation of any supplemental documents, will be pursuant to CEQ's implementing regulations." 7 C.F.R. § 372.8(b)(1) (1995).

62.     APHIS revised its NEPA regulations in 2018, but retained their reliance on parallel CEQ and USDA NEPA requirements. *See* 83 Fed. Reg. 24003 (May 24, 2018) (noting "the APHIS regulations supplement the CEQ regulations and the USDA NEPA implementing regulations to take into account APHIS missions, authorities, and decision making"). The explicit requirement to comply with CEQ's NEPA regulations was recodified at 7 C.F.R. § 372.7. *See* 83 Fed. Reg. at 24011. Thus, APHIS's regulations retained the requirements to publish a draft EIS (per 40 C.F.R. § 1502.9 (2024)) and provide an opportunity for comment on it (per 40 C.F.R. § 1503.1(a)(2)(v) (2024)), as well as the requirement to involve the public in the preparation of an EA "to the extent practicable" (per 40 C.F.R. § 1501.5(f) (2024)).

*Congressional Response to NEPA Implementation*

63.     Congress has reinforced the understanding expressed in CEQ's and USDA's prior regulations that public comment is required for draft EISs. For example, in statutes aimed at expediting NEPA reviews, Congress has limited the length of comment periods on draft EISs, based on the premise that notice and comment on draft EISs is required. *See*, *e.g.*, 42 U.S.C. §

4370m-4(d)(1), Fixing America's Surface Transportation Act ("FAST Act"), Pub. L. No. 114-94, 129 Stat. 1741 (2015) (setting both minimum and maximum lengths for draft EIS comment periods—"not less than 45 days" and "not more than 60 days"—for certain transportation, energy, manufacturing, and other projects); 33 U.S.C. § 2348(g)(2)(A), Water Resources Reform and Development Act of 2014, Pub. L. No. 113–121, title I, § 1005(a)(1), 128 Stat. 1205 (2014) (establishing "a [public comment] period of not more than 60 days" for "acceleration" of water resource development projects); 23 U.S.C. § 139(g)(2)(A)-(B), Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109–59, 119 Stat. 1862 (2005) (same for "efficient environmental reviews" for highway projects); 49 U.S.C. § 47171(m)(2)(A), FAA Reauthorization Act of 2024, Pub. L. No. 118–63, 138 Stat. 1307 (2024) (same for "expedited, coordinated" reviews for aviation projects).

64.    Likewise, Congress has reinforced the understanding expressed in CEQ's and USDA's prior regulations that the preparation of EAs requires public involvement. 16 U.S.C. § 6514(g), Infrastructure Investment and Jobs Act, Pub. L. No. 117–58, div. D, title VIII, § 40807, 135 Stat. 1097 (2021) ("In accordance with section 102(2) of [NEPA] (42 U.S.C. 4332(2)) and the applicable regulations and administrative guidelines, the Secretary shall provide an opportunity for public comment during the preparation of any environmental assessment or environmental impact statement for an authorized hazardous fuel reduction project."); *id.* § 6592c(c)(3), Pub. L. 117-58, § 40803, 135 Stat. 1113 (requiring same for emergency actions).

## C.    APA RULEMAKING PROCEDURES

65.    The APA, 5 U.S.C. § 551 *et seq.*, provides general rules governing the issuance of proposed and final regulations by federal agencies. Fundamental to the APA's procedural framework is the requirement that, absent narrow circumstances, a federal agency publish as a proposal any rule that it is considering adopting, and allow the public the opportunity to submit written comments on the proposal. 5 U.S.C. § 553.

66.    A "rule" is defined by the APA as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe

law or policy or describing the organization, procedure, or practice requirements of an agency…" *Id.* § 551(4).

67.     The APA provides that all federal agencies must provide "general notice" of any "proposed rule making" to the public by publication in the Federal Register. *Id.* § 553(b). The publication must, at a minimum, include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.*

68.     The APA requires that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* § 553(c).

69.     The foregoing APA public notice and comment procedures do not apply to "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A), or to "interpretative rules," *id.* An agency may only short circuit the public notice and comment requirements of the APA if it finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B).

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     Executive Order 14154 and CEQ's Rescission of its Regulations

70.     On January 20, 2025, President Trump issued Executive Order 14154, *Unleashing American Energy* (Jan. 20, 2025).

71.     Section 5 of the Executive Order—titled "Unleashing Energy Dominance through Efficient Permitting"—directed CEQ to "propose rescinding CEQ's NEPA regulations found at 40 CFR 1500 *et seq.*" within 30 days of the executive order. EO 14154, § 5(b), 90 Fed. Reg. at 8355.

72.     Section 5 further directed that, once CEQ issued its new NEPA guidance, CEQ "shall convene a working group to coordinate the revision of agency-level implementing

regulations for consistency." *Id*. § 5(c). Section 5 also directed that the CEQ guidance and the agency-level implementing regulations "must expedite permitting approvals," and that "[c]onsistent with applicable law, all agencies must prioritize efficiency and certainty over any other objectives, including those of activist groups, that do not align with the policy goals set forth in section 2 of this order or that could otherwise add delays and ambiguity to the permitting process." *Id*.

73.    Executive Order 14154 states that "[i]t is the policy of the United States … to guarantee that all executive departments and agencies … provide opportunity for public comment." *Id*. § 2(h), 90 Fed. Reg. at 8354.

74.    Subsequently, CEQ issued an interim final rule rescinding CEQ's NEPA implementing regulations, effective April 11, 2025. *See* 90 Fed. Reg. 10610 (Feb. 25, 2025). CEQ also issued guidance to federal agencies on NEPA implementing procedures, including NEPA implementation in the absence of CEQ regulations and while agencies revise their NEPA procedures. *See* CEQ, Memorandum for Heads of Federal Departments and Agencies, Implementation of the National Environmental Policy Act (Feb. 19, 2025).[1] CEQ has since conferred and coordinated with federal agencies to guide agency revision of their NEPA procedures.

75.    CEQ directed all agencies to update their NEPA procedures within 12 months. *Id*. at 7. In the absence of CEQ regulations, CEQ advised agencies that "[w]hile these revisions are ongoing, agencies should continue to follow their existing practices and procedures for implementing NEPA consistent with the text of NEPA, E.O. 14154, and this guidance." *Id*. at 4.

**B.    USDA's Rescission of NEPA Regulations**

76.    On July 3, 2025, USDA issued an Interim Final Rule without any public notice and comment. 90 Fed. Reg. 29632 (July 3, 2025). The Interim Final Rule rescinded the NEPA

---

[1] Available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-Memo-Implementation-of-NEPA-02.19.2025.pdf, superseded by Sept. 29, 2025 Memorandum, available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Agency-NEPA-Implementation-Guidance.pdf.

regulations of all USDA sub-agencies and consolidated all agency-wide NEPA procedures into the USDA regulations at 7 C.F.R. Part 1b.

77.    The regulations enacted through the Interim Final Rule eliminated the requirement to publish a draft EIS, as well as any requirement to solicit input from the public on an EIS. *Compare* 7 C.F.R. § 1b.7(d) (making entirely discretionary whether USDA or its sub-agencies request comments from State, Tribal, or local governments; other agencies; the project applicant; or the public), *with* 7 C.F.R. § 1b.1(a) (1995) (incorporating CEQ regulations) *and* 40 C.F.R. §§ 1502.9, 1503.1(a)(2)(v) (2024) (requiring draft EIS and opportunity for public comment).

78.    In addition, the Interim Final Rule eliminated the requirement for the Forest Service to solicit "scoping comments" on the scope of issues to be addressed in any NEPA review, including an EA or CE. *Compare* 7 C.F.R. § 1b.3(e), (g), *with* 36 C.F.R. § 220.4(e)(1) (requiring scoping for "all Forest Service proposed actions").

79.    USDA's rulemaking provides only a cursory rationale for the removal and/or drastic revision of public participation procedures, stating that "NEPA (the Act itself) does not require publication of a draft EIS," and that publishing notice of a draft EIS "adds time and unnecessary process." 90 Fed. Reg. at 29637. The rulemaking does not acknowledge, let alone justify, changes to public participation procedures for EAs and categorical exclusions, and its departure from CEQ's former public participation requirements, on which those procedures were based.

80.    USDA's rulemaking was finalized and made immediately effective as an "interim final rule" without any advance public notice of, or an opportunity to comment on, the rule. USDA determined that notice-and-comment rulemaking was not required on four grounds:

        a.    First, USDA's rulemaking states that the rule falls within the APA exception for "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A), because they are purportedly "purely procedural" rules that "prescribe how USDA will conduct NEPA reviews." 90 Fed. Reg. at 29644.

b.  Second, USDA's rulemaking states that portions of the rule fall within the APA exception for "interpretative rules," 5 U.S.C. § 553(b)(A), as they purportedly "provide[] an interpretation of a statute, rather than make discretionary policy choices that establish enforceable rights or obligations for regulated parties under delegated congressional authority." 90 Fed. Reg. at 29644.

c.  Third, USDA's rulemaking states that portions of the rule fall within the APA exception for "general statements of policy," 5 U.S.C. § 553(b)(A), as they purportedly "provide notice of an agency's intentions as to how it will enforce statutory requirements … without creating enforceable rights or obligations for regulated parties under delegated congressional authority." 90 Fed. Reg. at 29644.

d.  Finally, USDA's rulemaking states that the rule satisfies the "good cause" exception under the APA because notice and comment purportedly would be "impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B), and there is "good cause" to make the rule effective immediately, *id*. § 553(d)(3). 90 Fed. Reg. at 29644-45. Purportedly, good cause exists because after the CEQ rescinded its NEPA regulations, USDA "operate[d] under its prior procedures as if the CEQ NEPA framework still existed," which was no longer "tenable." 90 Fed. Reg. at 29645.

## CLAIM ONE

**(Failure to Provide Notice and Comment on and Delay the Effective Date of the Interim Final Rule)**

81.  Plaintiffs incorporate by reference all paragraphs listed above.

82.  USDA's Interim Final Rule constitutes a "rule" within the meaning of the APA, 5 U.S.C. §§ 551 and 553. This rule includes USDA's rescission and/or revision of NEPA procedures contained within 36 C.F.R. Part 220 (Forest Service), 7 C.F.R. Part 372 (APHIS), and other sub-agency regulations, as well as USDA's revision of 7 C.F.R. Part 1b.

83.     USDA's rulemaking was implemented immediately, without any publication of a general notice of proposed rulemaking in the Federal Register and without any opportunity for interested persons to participate in the rulemaking process before the rule went into effect, as required by the APA, 5 U.S.C. § 553(b) and (c).

84.     USDA's determinations that it need not provide advanced publication of a proposed rule, nor provide the public with an opportunity to participate, nor delay the rule's effective date, because the Interim Final Rule establishes "rules of agency, organization, procedure, or practice," 5 U.S.C. § 553(b)(A), "interpretative rules," and/or "general statements of policy," *id.*, are arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

85.     Likewise, USDA's determinations that it need not provide advanced publication of a proposed rule, nor provide the public with an opportunity to participate in USDA's rulemaking process, nor delay the rule's effective date, because doing so would be either impracticable, unnecessary, or contrary to the public interest is arbitrary, capricious, and not in accordance with law, in violation of 5 U.S.C. § 706(2).

## CLAIM TWO

**(Failure to Provide a Reasoned Explanation for the Substantial Curtailment of Public Participation Requirements within the Interim Final Rule)**

86.     Plaintiffs incorporate by reference all paragraphs listed above.

87.     USDA's rulemaking fails to provide a reasoned explanation for the evisceration of public participation in NEPA reviews, as embodied in the Interim Final Rule.

88.     Moreover, USDA's rulemaking fails to explain how the Interim Final Rule is consistent with Executive Order 11514 § 2(b), Executive Order 14154 § 2(h), and with NEPA's requirements that federal agencies "to the fullest extent possible," 42 U.S.C. § 4332, (1) "identify and develop methods and procedures … which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations," *id.* § 4332(2)(B); (2) "in cooperation … with concerned public and private organizations … use all practicable means and measures … in a

manner calculated to" serve NEPA's environmental objectives, *id*. § 4331(a), and (3) "use all practicable means … to improve and coordinate Federal plans, functions, programs, and resources" for NEPA's environmental protection aims, *id*. § 4331(b).

89.    USDA's unexplained evisceration of public participation procedures via the Interim Final Rule was also arbitrary and capricious because USDA's rulemaking failed to acknowledge and adequately explain the departure from USDA's longstanding approach to NEPA implementation, and failed to consider the longstanding recognition that public involvement is essential to the proper functioning of NEPA, and that public involvement in NEPA reviews is a necessary and practicable means of achieving NEPA's aims.

90.    USDA's failure to rationally explain its rulemaking is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2) and NEPA, 42 U.S.C. §§ 4331(a)-(b), 4332(2)(B).

## RELIEF REQUESTED

Plaintiffs respectfully request that the Court:

(A)    Declare that USDA violated the Administrative Procedure Act in the development and issuance of the Interim Final Rule due to its failure to provide public notice and comment on the Interim Final Rule and failure to provide a reasoned explanation for changes to USDA's public participation procedures adopted in the Interim Final Rule, including its removal of requirements for public notice and comment on draft EISs, public participation in EAs, and public scoping on EAs and CEs for Forest Service projects;

(B)    Declare that USDA's Interim Final Rule violated the APA and NEPA, 42 U.S.C. §§ 4331(a)-(b), 4332(2)(B), by failing to consider relevant factors under NEPA;

(C)    Vacate the Interim Final Rule, including its rescission of regulations at 36 C.F.R. Part 220 and 7 C.F.R. Part 372, as well as its revision of regulations at 7 C.F.R. Part 1b;

(D)    Issue an injunction ordering that, until and unless they comply with the APA, USDA and its sub-agencies shall operate under the NEPA procedures regarding public participation that USDA applied before the Interim Final Rule took effect;

1      (E)     Retain jurisdiction of this matter for purposes of enforcing and effectuating the

2  Court's order;

3      (F)     Grant Plaintiffs their reasonable costs of litigation, including attorneys' and expert

4  fees; and

5      (G)     Grant such further relief as the Court deems just and proper.

Respectfully Submitted,

*/s/ Wendy Park*
Wendy Park (Cal. Bar No. 237331)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin, Suite 375
Oakland, CA 94612
Tel: 510-844-7138
Email: wpark@biologicaldiversity.org

Brandon Jones-Cobb (AK Bar No. 1610078)
(*pro hac vice* pending)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 1178
Homer, AK 99603
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org

Hannah Connor (VA Bar No. 74785)
(*pro hac vice* pending)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St. NW, Suite 1300
Washington, DC 20005
Phone: 202-681-1676
Email: hconnor@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity and Sierra Club*

Nathaniel Shoaff (Cal. Bar No. 256641)
Elizabeth Benson (Cal. Bar No. 268851)
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
Phone: 415-977-5610
Email: nathaniel.shoaff@sierraclub.org
Email: elly.benson@sierraclub.org

*Attorneys for Sierra Club*

DATED:     January 28, 2026